Raymond C. Spencer, Appellee, v. Ruth Ann Wilsey, Executrix of Last Will and Testament of Irven H. Wilsey, Deceased, Appellant. DeVry Corporation and Federal Electric Company, Inc., Defendants.

Gen. No. 43,510.

440

Opinion filed February 5, 1947. Released for publication March 17, 1947.

McKINNEY, FOLONIE & GREAR, of Chicago, for appellant.

ROSENTHAL, ELDRIDGE, KING & ROBIN, of Chicago, for appellee; WILLARD L. KING, of Chicago, of counsel.

MR. PRESIDING JUSTICE LEWE delivered the opinion of the court.

Plaintiff filed a complaint in equity to rescind a contract on the ground of fraud and misrepresentation and for an accounting of profits derived from the exploitation of an invention. The cause was put at issue and referred to a master. In conformity with the master's findings and recommendations contained in his report, a decree was entered in favor of plaintiff. Defendant Ruth Ann Wilsey, as executrix of the last will and testament of Irven H. Wilsey, appeals.

On July 22, 1941, plaintiff and Irven Wilsey, an inventor, entered into a written contract which reads as follows:

"IRVEN H. WILSEY
Wrigley Building
Chicago

July 22, 1941.

"Mr. Raymond C. Spencer,
7110 Princeton Ave.,
Chicago, Illinois.

Dear Mr. Spencer:

"In accordance with our understanding, I hereby agree that I will transfer to you one-fourth of the profits, as and when accrued, resulting from our exploitation of my invention on a military-training and shooting-gallery apparatus, entirely owned by myself, and of improvements and patents, both U. S. and foreign, to be obtained on same. Preliminary crude sample of this apparatus is now in my shop as you know.

"It is further understood that I am to immediately proceed with the building of a commercial machine together with complete drawings and specifications for the manufacture, in the production of same. When finished every reasonable effort will be made by both of us to make this a financial success by sales, licenses, etc.

"For this one-fourth sharing interest in the profits, whether monies, stocks or other income, you are to pay me $5000.00 as follows: $2500.00 now, the receipt of which is hereby acknowledged, and $2500.00 upon the completion of the commercial machine above mentioned.

"This agreement is also binding on our heirs.

"Yours very truly,
(Signed) IRVEN H. WILSEY,
IRVEN H. WILSEY,
514 Wrigley Bldg.,
Chicago, Illinois.

Accepted by:
(Signed) RAYMOND C. SPENCER.
RAYMOND C. SPENCER.
July 22, 1941.

"Signatures of Irven H. Wilsey and Raymond C. Spencer, witnessed July 22, 1941.

(Signed) EARL GOSSWILLER
EARL GOSSWILLER"

In March 1942, plaintiff went to California and at that time engaged one Harold V. Snyder, an attorney, to represent him in transactions with Wilsey. In August 1942 Wilsey commenced negotiations with Snyder to repurchase plaintiff's interest in the invention. These negotiations culminated in a written contract on February 18, 1943, under the terms of which plaintiff agreed ''to release any and all interest'' which he had in the ''apparatus'' and any rights accruing to him by reason of the agreement dated July 22, 1941, upon the repayment by Wilsey to plaintiff of the sum of $5,000. Irven Wilsey died on July 24, 1943.

The decree found, among other things, that plaintiff and Wilsey were engaged in a joint venture and that a fiduciary relation existed between plaintiff and decedent Wilsey by virtue of said joint venture; that all of the files, records, correspondence, contracts and papers relating to the exploitation of the invention were in exclusive possession and control of Wilsey; that shortly before August 10, 1942, witness Harold V. Snyder had been engaged by plaintiff to secure an accounting under the contract of July 22, 1941, which Wilsey refused for the reason that there were no profits realized from the apparatus mentioned therein; that on August 10, 1942 Wilsey came to the office of Snyder and represented to him that there was no activity whatever in the exploitation of the invention; that afterwards on January 27, 1943 Wilsey again made substantially the same representations to Snyder and that he had a plan to put all his inventions in one corporation wherein some other men were interested and wanted everything he, Wilsey, had invented to put into the corporation, including the invention cov-

ered by the contract of July 22, 1941; that on or about February 11, 1943 Wilsey renewed negotiations with Snyder, and characterized the invention as "a dead item," stating that there was no activity in it, that it had no future, and that the materials to build it could not be obtained; that after the war it would be obsolete and that it had no value and was lying dormant, and that he never expected it to be revived; that on February 15 or 16, 1943 Wilsey again stated to Snyder that the invention had no prospect and that the item was dead and never would be revived.

The decree further found that the foregoing representations made by Wilsey to Snyder were false; that on February 25, 1942, one Linderman, Chief Engineer of the Bureau of Aeronautics of the Navy Department, had inspected the device and thought it had considerable merit; that Linderman advised certain improvements be made upon the same and that it be taken to Washington and demonstrated to officers of the Navy; that on March 30, 1942, Wilsey, one Gosswiller an employee, and one Reed took the model to Washington and demonstrated it to officers of the Navy, who suggested that an entirely new model be made incorporating additional changes, and verbally suggested that Wilsey build the same at a cost not to exceed $10,000; that the Government afterwards, on July 9, 1942, made a contract with Wilsey, agreeing to pay him the sum of $9,985.73 for this new model; that thereafter Wilsey received an order to make two additional units for the sum of $4,225.98 each, and Wilsey was paid by the Government therefor, having received for the first model the sum of $9,985.73 and the sum of $4,225.98 each for the second units; that in the latter part of June 1942 Wilsey again went to Washington and demonstrated the new models to officers of the United States Navy; that in July 1942, pursuant to instructions of officers of the Navy, Wilsey had commenced the construction of the third model of said machine;

that in July 1942 Wilsey had been requested by officers of the Navy to submit a proposal for the manufacture and sale to the Navy of 500 of said machines; that in August 1942 Wilsey had arranged with the DeVry corporation, one of the defendants herein, the president of which had been called to Washington to take part in the negotiations, to submit a proposal to the Bureau of Aeronautics for the manufacture of 500 of said machines; that the Government wanted 50 units built by defendant DeVry corporation as soon as possible; that Wilsey made a third trip to Washington in September 1942 to demonstrate a new model of said machine, and was told by the officers of the Navy that the Navy would immediately buy 500 of said machines, and that thereafter the Navy might make a substantial contract for quite a quantity of said machines, since there were a lot of training bases where such machines could be used and gunnery training in the United States Navy was very important; that during said period arrangements were made with the Jam Handy corporation to furnish film for the device and different officers of the Navy had been to Chicago making suggestions as to the building of several models; that on September 29, 1942 Wilsey had entered into a contract with the DeVry corporation whereby Wilsey was to receive six per cent of the sales price of said machines as royalty, and had also entered into a contract with the Government which provided an additional five per cent for engineering services; that under date of December 26, 1942, the Navy entered into a contract with the DeVry corporation to build 500 of said machines at the price of $823.20 per machine; that plaintiff had no knowledge or means of knowledge in the premises except as he was informed by Wilsey of said activities connected with said machine, and believed the statements of said Wilsey made as aforesaid to Snyder, and in reliance on such beliefs was induced by said Wilsey to enter into the contract of Feb-

ruary 18, 1943, under the terms of which Spencer "agreed to release any and all interest in the apparatus and any rights accruing by reason of any agreement respecting said machine, and particularly the agreement of July 22, 1941." That during said period Wilsey became entitled to a royalty of six per cent upon the sales price of 500 machines at $823.20 each, aggregating $24,696, 25 per cent of which amounted to $6,174; that Wilsey had collected for models made by him for the Government sums aggregating $18,437.69, 25 per cent of which amounted to $4,609.42. This sum would be subject to a deduction for the reasonable cost of constructing said models, of which the record is silent. And Wilsey, under his contract with the Government, was entitled to receive an additional five per cent upon the sales price of the machines covered by the DeVry contract, which amounted to $20,580, 25 per cent of which is $5,145. This amount would be subject to deduction of a reasonable amount to cover necessary engineering services, of which the record is silent. That from the expressed attitude of the Government officers it would be reasonable for a person to conclude that additional machines would be ordered by the Government from which Wilsey would receive additional royalties.

 We think the evidence amply justifies the finding that plaintiff and Wilsey were engaged in a joint venture.

A joint adventure had been broadly defined as an enterprise undertaken by several persons jointly, and, more particularly, as an association of two or more persons to carry out a single business enterprise for profit. (30 Am. Jur. 83, p. 677.)

It appears that all the books and documents relating to the enterprise were in Wilsey's sole possession; that experimentation on the apparatus was conducted and controlled by Wilsey in secrecy, and that the information which he had with respect to the exploitation of his invention was withheld from plaintiff.

In *Hagerman v. Schulte,* 349 Ill. 11, 21, the court said: "While a joint adventure is not regarded as identical with a partnership, the relation of the parties is so similar that their rights and liabilities are usually tested by the rules which govern partnerships. The relation between joint adventurers is fiduciary in its nature, and their conduct to one another must be governed by the utmost confidence and good faith."

The governing principle was stated by Chief Judge Cardozo in *Meinhard v. Salmon,* 249 N. Y. 458, 463: "Joint adventurers, like co-partners, owe to one another, while the enterprise continues, the duties of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place."

Defendant asserts that plaintiff had actual knowledge of at least most of the facts which he claims Wilsey misrepresented and that he had adequate means and was afforded ample opportunity to make investigation in order to ascertain whatever other details he might have desired before the contract of February 18, 1943 was made.

The evidence shows that Spencer obtained a new position early in March 1942 and left the State. During the same month Wilsey demonstrated an original model of his machine to several officers of the United States Navy at Washington, D. C. He was requested by the Navy to prepare a new model at a cost of not more than $10,000. Defendant's witness Gosswiller did not disclose this information to plaintiff, on the ground that it was Wilsey's duty to tell him about it. In any event it was Wilsey's duty as a co-adventurer to make a complete disclosure to plaintiff of all of his negotiations with the Government. The evidence clearly shows Wilsey failed to do so.

Defendant contends that Harold Snyder was an incompetent witness under sections 2 and 4 of the

Evidence Act (Ill. Rev. Stat. 1943, State Bar Asso. Ed. 51).

In their brief defendant's counsel say that Snyder waived fees due him from plaintiff for legal services and refrained from acting as attorney for plaintiff for the sole purpose of testifying in behalf of plaintiff and that plaintiff relies solely on the testimony of Snyder to establish the alleged false representations and concealment of facts by Wilsey.

So far as the record discloses all the negotiations to repurchase plaintiff's interest were carried on by Snyder and Wilsey and no other person was present during these negotiations except on one occasion. On direct examination Snyder testified, ''I told Mr. Spencer then that I would not be able to represent him, if he wanted to attempt to set this contract aside, that I would no doubt be an indispensable witness, and our ethics did not allow a lawyer to testify and represent him. So I told him he would have to get another lawyer. . . . I suggested Mr. King.'' Snyder denied that there were any fees due him from plaintiff, and the master expressly found that Snyder ''had no pecuniary interest in the result of the suit.''

Whether plaintiff owed witness Snyder fees is in our opinion immaterial. The interest which will render a witness incompetent must be such an interest in the judgment or decree that a pecuniary gain or loss will come to him directly as the immediate result of the judgment or decree. (*Britt v. Darnell,* 315 Ill. 385, 392.) If the testimony of the witness does not show such direct, certain and immediate interest, his interest, if any, goes merely to his credibility and not to his competency. (*Flynn v. Flynn,* 283 Ill. 206, 217; *Creighton v. Elgin,* 387 Ill. 592, 605.)

Application of the tests announced in the foregoing authorities to the facts in the instant case leaves no doubt that Snyder's testimony is competent.

Finally defendant maintains that the decree establishes an improper basis for an accounting. Defend-

ant complains that "deductions from royalties are by the decree limited to the reasonable costs of constructing said models." The master indicated that other deductions should be made for engineering services. Under the provisions of the decree defendant is not precluded from making proof of these deductions, if any, on the accounting when the matter is re-referred to the master.

On February 18, 1943 Wilsey, according to the computations made by the master, had received or had contracts to receive on models and royalties the aggregate sum of $64,637.69. Under his contract of July 22, 1941, Spencer was entitled to one-fourth of this sum. The chancellor found that the repayment of $5,000 by Wilsey to plaintiff under the contract of February 18, 1943 was "a grossly inadequate consideration." We are in accord with that finding.

In the view which we take of this case it is unnecessary to consider the other points raised. For the reasons stated, the decree is affirmed.

*Decree affirmed.*

KILEY and BURKE, JJ., concur.