MARIA BERNARDI, Indiv. and as Adm'r for the Estate of Michael P. Bernardi, Plaintiff-Appellant, v. CHICAGO STEEL CONTAINER CORPORATION *et al.*, Defendants-Appellees.

First District (2nd Division) No. 1—87—3677

Opinion filed August 29, 1989.

George M. Elsener and Francis William Golden, both of George M. Elsener & Associates, of Chicago, for appellant.

Bruce Farrel Dorn, of Brenner, Mavrias, Dorn & Alm, and James T. Ferrini, John M. Hynes, and Sonia V. Odarczenko, all of Clausen, Miller, Gorman, Caffrey & Witous, P.C., both of Chicago, for appellees.

JUSTICE DiVITO delivered the opinion of the court:

This is an appeal from a judgment entered on a jury verdict against plaintiff in a wrongful death action. Plaintiff alleges that the trial court erred in (1) allowing two witnesses to testify in violation of the Dead Man's Act (Ill. Rev. Stat. 1985, ch. 110, par. 8—201); (2) submitting to the jury special interrogatories which confused the jury with regard to plaintiff's burden of proof; (3) failing to allow a count alleging negligence under the *res ipsa loquitur* doctrine or failing to direct a verdict based on that doctrine; and (4) failing to direct a verdict or grant a new trial against the corporate defendant.

Chicago Steel Container Corporation (Chicago Steel) manufactures industrial drums at 1846 South Kilbourne Street in Chicago. Michael Bernardi was an independent contractor retained by Chicago Steel to repair Chicago Steel vehicles. Bernardi repaired Chicago Steel's vehicles "after hours" in Chicago Steel's yard, used his own tools, and decided on his own methods in repairing the vehicles.

On November 26, 1981, Bernardi was working on a vehicle in Chicago Steel's yard. Bernardi was accompanied by Roger Mollenhour (Mollenhour) and Mollenhour's 10-year-old son. Mollenhour was sitting in the driver's seat of the vehicle, while Bernardi was "priming" the engine by pouring gasoline into the carburetor. The engine compartment of the vehicle caught fire and Bernardi was fatally burned.

Plaintiff filed suit against Mollenhour and Chicago Steel. Plaintiff charged that Mollenhour negligently caused the death of Michael Bernardi by prematurely starting the vehicle's engine while Bernardi was priming the carburetor. Plaintiff charged that defendant Chicago Steel was negligent in failing to provide working fire extinguishers in its yard where vehicles were repaired. Before trial, plaintiff filed a motion for leave to amend her complaint in order to add a count alleging that Mollenhour was negligent under the theory of *res ipsa loquitur*. That motion was denied on the ground that Mollenhour did not have exclusive control over the instrumentality that caused Bernardi's injury.

At the trial, Bernardi's daughter testified that after the occurrence on November 26, 1981, Mollenhour admitted that he had made "a mistake" by "start[ing] the engine too soon." According to Bernardi's daughter, Mollenhour also stated that he did not "think [he] waited for the signal" and did not "remember if [Bernardi] gave [him] the signal." Bernardi's son testified that after the occurrence, Mollenhour admitted that "it was [his] fault that it happened." According to Bernardi's son, Mollenhour stated that he felt "guilty" and that he was "not sure whether [he] heard the signal or not[,] but started [the engine] at the wrong time." Five other witnesses, all friends of the Bernardi family, gave similar testimony.

Tom Mollenhour, defendant's son, testified that he was present at the time of the occurrence on November 26, 1981. Tom was 10 years old at the time of the occurrence and 15 years old at the time of the trial. According to Tom, Bernardi told Mollenhour that he was going to prime the carburetor and that he would tell him when to start the vehicle. Bernardi had a two-pound coffee can half full with gasoline. He instructed Mollenhour in the manner of starting the vehicle, then went to the passenger's side, leaned over the engine, tilted the can

for three or four seconds, straightened up with the can in his hand and, finally, told Mollenhour to try starting the vehicle. Flames then came out of the vehicle and engulfed Bernardi. Mollenhour pushed Bernardi down, rolled him over in an attempt to extinguish the fire, and then ran into Chicago Steel's building to get a fire extinguisher. Plaintiff objected to Tom's testimony on the ground that it violated the Dead Man's Act (Ill. Rev. Stat. 1985, ch. 110, par. 8—201).

Mollenhour conceded that he spoke with plaintiff's witnesses after the accident and told them that the accident was "his fault." However, Mollenhour testified that he never stated to any of plaintiff's witnesses that he started the engine before a signal was given or before Bernardi was through pouring the gasoline. For example, Mollenhour testified that he told Bernardi's son that he started the engine when he was told to do so.

The trial court did not permit Mollenhour to testify to events which occurred in the presence of Bernardi. Rather, Mollenhour was permitted only to explain or deny his conversations with plaintiff's witnesses. The trial court stated: "This is a very close question of whether or not he is going to be able to testify. What happened at the scene as compared to what his responses were relative to alleged admissions, that's all he's trying to deal with." Plaintiff's attorney then stated: "Again I think he has a right to explain them and deny them but not to get into what happened." The only objections made thereafter by plaintiff concerning Mollenhour's testimony were objections to leading questions and inadequate foundations.

In regard to plaintiff's case against Chicago Steel, Bernardi's daughter testified that Mollenhour told her after the occurrence that he found a fire extinguisher on Chicago Steel's premises, but that it "broke" when he "tried to pull the pin out." Otto Sorino, a vice-president at Chicago Steel, testified that he had placed a fire extinguisher in the yard outside the Chicago Steel plant some time after 1971, but that it had been stolen prior to November 1981 and never replaced.

Sorini also testified that fire extinguishers were placed throughout the Chicago Steel building in accordance with Chicago fire department regulations. Sorini testified that his earlier decision to put a fire extinguisher in the yard was "strictly a personal decision."

Louis Trilla of Chicago Steel testified that Chicago Steel had 22 fire extinguishers in its building placed in accordance with Chicago fire department regulations. According to Trilla, the fire department inspected Chicago Steel's premises annually and had never issued a citation. Trilla stated that the last inspection prior to November 26, 1981, was in August or September of 1981.

Consistent with Trilla's testimony, Lieutenant Harry Benson of the Chicago fire department searched Chicago Steel's records and found no citations against Chicago Steel. Benson testified that a Municipal Code violation could occur without a report of any violation being made and that there was a Municipal Code requirement that outdoor fire retardant materials be present at locations where wood is stored or where gasoline is distributed or stored. Apparently, wood pallets and full and empty paint cans were present in the Chicago Steel yard, but the paint was noncombustible.

Mollenhour testified that he ran into Chicago Steel's main building after Bernardi caught fire and found a fire extinguisher on a post located about five feet from the entrance. That extinguisher was about 80 feet from the point where Mollenhour first ran in search of a fire extinguisher. One to three minutes had elapsed before Mollenhour found the fire extinguisher. Mollenhour picked up the fire extinguisher, but the pin "bent" and "prevent[ed] [him] from getting it out."

Sorini then testified that he arrived at Chicago Steel at 9 a.m. on November 27, 1981, and found the fire extinguisher that Mollenhour had picked up lying on its side outside the overhead doors to the truck bay. Sorini examined the fire extinguisher and found the pin bent, but was nevertheless able to pull the pin out and squeeze the handle. When Sorini squeezed the handle, the fire extinguisher emitted a white chemical cloud.

David Chambers, called by plaintiff as an expert in the process of priming an engine, testified that priming is a "very, very dangerous procedure" and there is "no safe way" to do it with an open can of gas nearby. According to Chambers, priming involves adding less than an ounce of fuel to the carburetor to encourage the first stroke of combustion, reattaching the air filter, putting the gas container in a safe place, moving to a point of safety and then turning the ignition.

Finally, several witnesses testified that Bernardi was a skilled mechanic with 37 years of experience; that Bernardi was aware of dangers confronting mechanics; that he was careful when confronting these dangers; and that he had instructed a number of people in the safe approach to mechanical work.

Two special interrogatories were submitted to the jury over plaintiff's objection. Special interrogatory No. 1 asked:

> "Was the defendant, Roger Mollenhour, guilty of negligence, at the time of the occurrence, which proximately caused the injuries and death of Michael P. Bernardi[?]"

The term "guilty" was not defined in the jury instructions. The jury

answered this interrogatory in the negative. Special interrogatory No. 2 asked:

"Do you find that Michael P. Bernardi at the time of the occurrence was exercising ordinary care for his own safety as to avoid proximately causing himself injury?"

The jury also answered this interrogatory in the negative.

The jury returned a verdict in favor of each defendant. The trial court entered judgment on the verdict and denied plaintiff's post-trial motion.

I

Plaintiff maintains that the testimony of Roger Mollenhour and his 15-year-old son, Tom Mollenhour, was admitted in violation of the Dead Man's Act. Specifically, plaintiff maintains that the trial court erred in allowing Mollenhour to testify that he did not tell plaintiff's witnesses that he started the engine before hearing Bernardi's signal. Plaintiff also maintains that Tom Mollenhour's testimony regarding events that took place in Bernardi's presence was admitted in violation of the Dead Man's Act. Plaintiff argues that Tom Mollenhour was not competent to give such testimony because he was an "interested person" for purposes of the Dead Man's Act.

■ The Dead Man's Act provides, in relevant part, that in a trial of any action in which any party sues or defends as the representative of a deceased person, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or to any event which took place in the presence of the deceased. (Ill. Rev. Stat. 1985, ch. 110, par. 8—201.) Under the Dead Man's Act, the testimony of adverse parties and interested persons is disqualified only to the extent that it is testimony concerning a conversation with the deceased or of an event which took place in the presence of the deceased. (*In re Estate of Babcock* (1985), 105 Ill. 2d 267, 273, 473 N.E.2d 1316; *Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 411, 496 N.E.2d 1116.) A waiver of the adverse or interested party's incompetency takes place to the extent that the representative of the deceased presents testimony of a witness concerning any conversation with the deceased or to any event which took place in the deceased's presence. *Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 411, 496 N.E.2d 1116.

■ In this case, seven of plaintiff's witnesses testified to statements made by Mollenhour after the occurrence on November 26, 1981. In particular, Bernardi's daughter testified that Mollenhour told

her he did not remember whether Bernardi gave him a signal. Bernardi's son testified that Mollenhour told him he was not sure "whether he heard the signal or not." The other five witnesses gave similar testimony. The trial court then permitted Mollenhour to explain or deny these conversations, but specifically directed Mollenhour not to testify to events which occurred in Bernardi's presence. Mollenhour testified that he told Bernardi's daughter that he "didn't start [the engine] until the signal was given." Mollenhour also testified that he told Bernardi's son that "[Bernardi] couldn't get the engine started. [Bernardi] said that it wasn't getting gas or something." Mollenhour similarly denied or explained his conversations with plaintiff's other witnesses.

Mollenhour was plainly incompetent to testify to events that took place in Bernardi's presence or to conversations with Bernardi. Because plaintiff's witnesses testified to conversations with Mollenhour, not to events occurring in Bernardi's presence or to conversations with Bernardi, plaintiff did not waive Mollenhour's incompetency to testify. See *Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, 411, 496 N.E.2d 1116 (waiver "requires that the testimony relate to a conversation with the deceased" and there is no waiver "merely in the case of testimony concerning a conversation with an adverse party").

Nonetheless, Mollenhour's testimony did not violate the Dead Man's Act because the purpose of Mollenhour's testimony was not to get before the jury the substance of his conversation with Bernardi or to relate any events which took place in Bernardi's presence. (See *In re Estate of Konow* (1987), 154 Ill. App. 3d 744, 506 N.E.2d 450.) Rather, Mollenhour merely gave his own version of his conversations with plaintiff's witnesses. Since Mollenhour was entitled to controvert his alleged admissions, his testimony in this case was properly admitted.

█ Tom Mollenhour's testimony likewise did not violate the Dead Man's Act. A witness is incompetent to testify under the Dead Man's Act only if the witness is "directly interested" in the action. (Ill. Rev. Stat. 1985, ch. 110, par. 8—201.) A "directly interested" witness is one whose interest in the judgment is such that a pecuniary gain or loss would come to him or her directly as the immediate result of the judgment. (*Brownlie v. Brownlie* (1932), 351 Ill. 72, 183 N.E. 613; *Michalski v. Chicago Title & Trust Co.* (1977), 50 Ill. App. 3d 335, 339, 365 N.E.2d 654.) For example, the spouse of a person who is incompetent to testify is also disqualified under the Dead Man's Act. (*In re Estate of Babcock*, 105 Ill. 2d 267, 473 N.E.2d 1316; *In re Estate of*

*Teehan* (1936), 287 Ill. App. 58, 4 N.E.2d 513.) But the prospective heir of a party or interested person is not incompetent to testify. (*Ackman v. Potter* (1909), 239 Ill. 578, 88 N.E. 231; *In re Estate of Franke* (1970), 124 Ill. App. 2d 24, 259 N.E.2d 841.) If the testimony of the witness does not show direct, certain and immediate pecuniary interest, the witness' interest, if any, goes merely to his or her credibility and not to his or her competency to testify. *Spencer v. Wilsey* (1947), 330 Ill. App. 439, 447, 71 N.E.2d 804.

Plaintiff argues that Tom Mollenhour was a "directly interested" person under the Dead Man's Act because a minor child is more dependent on his or her parent for support than one spouse is on another. Plaintiff argues that a minor's interest in the assets and liabilities of his or her parent is reflected in the statutory right of children to the physical, mental, emotional and monetary support of their parents. This dependency, plaintiff argues, establishes that Tom Mollenhour would suffer direct and immediate pecuniary loss if his father does not prevail in this lawsuit.

However, there is no support for plaintiff's position. Contrary to plaintiff's assertion, *Kamberos v. Magnuson* (1987), 156 Ill. App. 3d 800, 510 N.E.2d 112, does not hold that the daughter of a "directly interested" person is herself incompetent to testify. In that case, the plaintiff filed suit against the defendant, seeking imposition of a constructive trust upon monies bequeathed to the defendant allegedly for the plaintiff's benefit, by the will of the deceased. The plaintiff subsequently died and her son was substituted as party plaintiff.

The court noted that the original plaintiff would have been barred by the Dead Man's Act from testifying to any conversation with the deceased or to any event which took place in the presence of the deceased. Upon the plaintiff's death, the court observed, her incompetency "logically extend[ed] to her daughter." (*Kamberos v. Magnuson* (1987), 156 Ill. App. 3d 800, 804, 510 N.E.2d 112.) The court reasoned that with the plaintiff's death, her daughter "no longer [had] merely a contingent interest in the litigation, but rather a direct, personal interest, which render[ed] her testimony incompetent under the Dead Man's Act." (*Kamberos v. Magnuson* (1987), 156 Ill. App. 3d 800, 804-05, 510 N.E.2d 112.) If the plaintiff had not died, the court stated, her daughter "might have been competent to testify, with only her credibility being affected by her then contingent interest." (*Kamberos v. Magnuson* (1987), 156 Ill. App. 3d 800, 804, 510 N.E.2d 112.) Thus, not only is *Kamberos* inapposite because Tom Mollenhour's father never died, but that case actually supports defendant's position that Tom's interest in the judgment was only "contingent."

*Borman v. Oetzell* (1943), 382 Ill. 110, 46 N.E.2d 914, relied on by plaintiff, is likewise inapposite. In that case, plaintiff sought to set aside certain deeds that had been executed by her late husband and to enjoin certain insurance companies from paying certain beneficiaries named in her late husband's life insurance policies. The plaintiff's adopted son was a devisee of the plaintiff's late husband and also a defendant in the lawsuit. The court stated that the plaintiff and her adopted son were both directly interested in the suit and, therefore, incompetent as witnesses on plaintiff's behalf. It is not clear how the plaintiff's adopted son, a party defendant, might have testified on the plaintiff's behalf. But it is clear that the plaintiff's adopted son, as a party to the lawsuit, had a direct pecuniary interest in the action. Thus, plaintiff's reliance on *Borman* is misplaced.

Accordingly, there is no support for plaintiff's contention that Tom Mollenhour was incompetent to testify. On the contrary, *Kamberos* suggests that Tom Mollenhour was competent to testify on Mollenhour's behalf and that any "contingent interest" Tom Mollenhour might have had in the outcome of this case affected only his credibility.

## II

Plaintiff asserts next that Mollenhour's special interrogatory No. 1, which asked whether Mollenhour was "guilty of negligence" at the time of the occurrence, was erroneously submitted to the jury because it confused the jury with regard to plaintiff's burden of proof. Plaintiff notes that the term "guilty" was not defined by the trial court.

Plaintiff also asserts that Mollenhour's special interrogatory No. 2, which asked whether Michael Bernardi "was exercising ordinary care for his own safety as to avoid proximately causing himself injury," aggravated the error in the submission of special interrogatory No. 1, because the inference could be drawn from the two interrogatories that Mollenhour did not have to shoulder the same burden of proof on the issue of Bernardi's contributory negligence.

■■ It is settled that a special interrogatory should not be submitted to the jury if it might confuse, mislead, or prejudice a party. (*Saldana v. Wirtz Cartage Co.* (1977), 55 Ill. App. 3d 440, 444, 370 N.E.2d 1131, *rev'd on other grounds* (1978), 74 Ill. 2d 379, 385 N.E.2d 664.) A special interrogatory should use the same language or terms that are contained in the jury instructions. (*Erickson v. Aetna Life & Casualty Co.* (1984), 127 Ill. App. 3d 753, 766, 469 N.E.2d 679; *Saldana v. Wirtz Cartage Co.*, 55 Ill. App. 3d at 444, 370 N.E.2d 1131.) However, a faulty special interrogatory can be cured when

other instructions and the evidence indicate that the jury was not confused by the interrogatory. *Zois v. Piniarski* (1982), 107 Ill. App. 3d 651, 653, 437 N.E.2d 1251.

In *Erickson v. Aetna Life & Casualty Co.* (1984), 127 Ill. App. 3d 753, 469 N.E.2d 679, a libel action, the court held that a special interrogatory, asking whether the defendant was "guilty of actual malice," was properly refused by the trial court. The court observed that the term "guilty" was not defined in the instructions. The jury was instructed, however, that the plaintiff was required to prove actual malice by "clear and convincing evidence." The court stated that because the term "guilty" is "most often used in the criminal law setting where proof beyond a reasonable doubt is the standard," the use of the term "could create an unnecessary ambiguity for the jury." *Erickson v. Aetna Life & Casualty Co.* (1984), 127 Ill. App. 3d 753, 766, 469 N.E.2d 679.

At the trial in this case, plaintiff objected to the use of the term "guilty" in special interrogatory No. 1. Plaintiff directed the trial court's attention to the *Erickson* case, and the trial judge then ordered defendant Mollenhour's attorney to rewrite the interrogatory leaving out the word "guilty." Mollenhour's attorney then said that he could not "retype" the interrogatory and told the trial judge that he took the language of the interrogatory from the interrogatory at issue in *Houston v. Leyden Motor Coach Co.* (1968), 102 Ill. App. 2d 348, 243 N.E.2d 293. The trial judge then changed his mind about deleting the term "guilty," apparently because *Houston* is a first district case, whereas *Erickson* is a second district case.

However, the court in *Houston v. Leyden Motor Coach Co.* (1968), 102 Ill. App. 2d 348, 243 N.E.2d 293, did not specifically approve of the use of the term "guilty" in the special interrogatory. In that case, the plaintiff alleged that the defendant was liable for injuries sustained when a bus door closed on her. The plaintiff claimed that the driver of the bus, as the bus company's agent, was negligent in operating the bus doors. A special interrogatory was submitted to the jury which asked: " 'Was the driver of the bus, Glen Baer, guilty of negligence which proximately caused injury to the plaintiff at the time of the occurrence?' " (102 Ill. App. 2d at 351.) The jury returned a verdict for the plaintiff and also responded to the interrogatory in the negative. The trial court then granted the plaintiff's motion to set aside the jury's answer to the interrogatory and to grant a new trial on the ground that the special finding was against the manifest weight of the evidence.

The defendant appealed, and the court held that the special find-

ing was not against the manifest weight of the evidence and was binding on the trial court. The parties never raised the issue of the propriety of the term "guilty" in the interrogatory, nor did the court consider whether the jury might have been confused by the use of that term. Thus, in this case, Mollenhour's reliance on the language of the interrogatory in *Houston* is misplaced.

■ Accordingly, under *Erickson* and other cases stating that special interrogatories should use the same language contained in the instructions, the trial court should have stricken the term "guilty" from special interrogatory No. 1. However, it does not follow that a new trial is warranted. The record does not reflect that the jury was confused over the appropriate burden of proof on the issue of Mollenhour's negligence. The jury was instructed that plaintiff had the burden of proving negligence by a preponderance of the evidence. Moreover, the jury's response to special interrogatory No. 1 was not necessarily inconsistent with the general verdict against plaintiff.

Special interrogatory No. 2 was properly given on the question of Bernardi's contributory negligence. A special interrogatory must be given when it is in proper form and relates to an ultimate issue of fact. (*Mudd v. Goldblatt Brothers, Inc.* (1983), 118 Ill. App. 3d 431, 454 N.E.2d 754.) In particular, the trial court must give a special interrogatory submitted by the defendant in proper form on the question of contributory negligence. (*Mudd v. Goldblatt Brothers, Inc.*, 118 Ill. App. 3d at 437, 454 N.E.2d 754.) In this case, special interrogatory No. 2 was in proper form and was not confusing or misleading. The concept of contributory negligence was explained to the jury in the instructions, as was the meaning of the term "ordinary care." Moreover, there is no merit to plaintiff's contention that special interrogatory No. 2 confused the jury about defendant's burden of proof, because that burden was explained in the instructions to the jury.

### III

Plaintiff maintains next that the trial court erred in refusing to permit her to add a *res ipsa loquitur* count to her complaint and in refusing to submit this issue to the jury. Plaintiff argues that it is not necessary to conclusively prove all elements of *res ipsa loquitur* before that theory may be invoked. Finally, plaintiff argues that the trial court should have directed a verdict in her favor on this count because the evidence established that Mollenhour was in control of the ignition system of the truck and prematurely turned the ignition.

■ The *res ipsa loquitur* doctrine permits the trier of fact to infer negligence based on circumstantial evidence. (*Imig v. Beck* (1986),

115 Ill. 2d 18, 503 N.E.2d 324.) When the doctrine is invoked, the plaintiff bears the burden of proving (1) that the occurrence is one that ordinarily does not occur in the absence of negligence, and (2) that the defendant had exclusive control over the instrumentality that caused the injury. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 500 N.E.2d 8.) The plaintiff need not conclusively prove these elements in order to invoke the doctrine, but must present evidence "reasonably showing that elements exist that allow an inference that the occurrence is one that ordinarily does not occur without negligence." (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 242, 500 N.E.2d 8; *Spidle v. Steward* (1980), 79 Ill. 2d 1, 9, 402 N.E.2d 216.) The inference that there was negligence does not disappear if the defendant simply presents direct evidence to the contrary; rather, the defendant's evidence is considered with all the other evidence in the case. (*Dyback v. Weber* (1986), 114 Ill. 2d 232, 242, 500 N.E.2d 8.) Application of the doctrine in a given case is a question of law which must be decided in the first instance by the trial court. *Imig v. Beck* (1986), 115 Ill. 2d 18, 27, 503 N.E.2d 324.

 In this case, the trial court properly decided that the *res ipsa loquitur* doctrine was not applicable. Illinois courts have repeatedly recognized that fires frequently have causes other than negligence. (See *Dyback v. Weber* (1986), 114 Ill. 2d 232, 243, 500 N.E.2d 8.) Plaintiff's own expert suggested that the process of priming a carburetor is dangerous even where ordinary care is exercised. For this reason alone, the *res ipsa loquitur* doctrine was inapplicable. But in addition, Mollenhour had control of only the ignition system. Bernardi himself was in control of the engine compartment of the vehicle. Thus, the *res ipsa loquitur* doctrine was also inapplicable because control of or responsibility for the vehicle was plainly divided between Mollenhour and Bernardi. See *Lynch v. Precision Machine Shop, Ltd.* (1981), 100 Ill. App. 3d 771, 775, 427 N.E.2d 176, *aff'd in part, rev'd in part* (1982), 93 Ill. 2d 266, 443 N.E.2d 569.

Because plaintiff could not make out even a *prima facie* case to invoke the *res ipsa loquitur* doctrine, her argument that the trial court should have directed a verdict in her favor on a *res ipsa loquitur* count is plainly without merit.

## IV

Finally, plaintiff maintains that Chicago Steel owed Bernardi a duty to provide a safe work place. Plaintiff asserts that Chicago Steel breached that duty by not providing working fire extinguishers within a reasonable distance from where its vehicles were repaired. Plaintiff

maintains that she was entitled to a directed verdict in her case against Chicago Steel or, alternatively, a new trial on the ground that the verdict was against the manifest weight of the evidence.

First, we need not decide whether Chicago Steel owed Bernardi a duty to provide a safe work place. The jury was instructed, over Chicago Steel's objection, that Chicago Steel owed Bernardi such a duty. Still, the jury returned a verdict in favor of Chicago Steel. Because we do not find that verdict to be against the manifest weight of the evidence, we do not reach the question of Chicago Steel's duty to provide a safe work place.

■ A verdict is against the manifest weight of the evidence only if it is palpably erroneous and wholly unwarranted. (*Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.) In this case, testimony at trial established that Chicago Steel kept 22 fire extinguishers on its premises, including an extinguisher 80 feet from the point where Mollenhour first ran in search of an extinguisher. There was also evidence adduced at trial that the fire extinguisher found by Mollenhour was in working condition. Furthermore, the evidence established that Chicago Steel's premises were regularly inspected by the Chicago fire department and that Chicago Steel had not received any citations prior to November 26, 1981. Thus, it cannot be said that the verdict in favor of Chicago Steel was palpably erroneous or wholly unwarranted.

Plaintiff was not entitled to a directed verdict unless review of all the evidence in the light most favorable to the defendant permitted a determination that the evidence so overwhelmingly favored plaintiff that no verdict for defendant could ever stand. (See *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) For the same reasons noted above that the verdict in favor of Chicago Steel was not against the manifest weight of the evidence, the evidence did not overwhelmingly favor plaintiff and plaintiff was not entitled to a directed verdict against Chicago Steel.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and SCARIANO, JJ., concur.