# Financial Interests of Nonprofit Organizations for Purposes of 18 U.S.C. § 208

Under 18 U.S.C. § 208, a nonprofit organization does not have a "financial interest" in a particular matter solely by virtue of the fact that the organization spends money to advocate a position on the policy at issue in the matter.

January 11, 2006

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF GOVERNMENT ETHICS

The primary criminal statute dealing with financial conflicts of interest, 18 U.S.C. § 208 (2000), prohibits a federal employee from participating in certain governmental matters if he or she is an officer or director of an organization that has a "financial interest" in the "particular matter." You have asked whether a nonprofit organization has a financial interest in a particular matter solely by virtue of the fact that the organization spends money to advocate a position on the policy at issue in the matter.[1] We conclude that a nonprofit organization does not have such a "financial interest" merely because it spends money on advocacy.

## I.

Section 208(a) forbids an officer or employee in his official capacity from participating "personally and substantially" in (among other things) any "particular matter in which, to his knowledge, . . . [an] organization in which he is serving as officer [or] director . . . has a financial interest." If the organization has a "financial interest," a federal employee serving on the board of the organization must recuse himself from any involvement in that particular matter, unless he can take advantage of a waiver or exemption issued under 18 U.S.C. § 208(b). Your question concerns employees who serve on the boards of nonprofit organizations that engage in advocacy with respect to particular matters pending before the employees' agencies. The question recently has arisen in two contexts.

In the first context, an official is considering service on the board of the Senior Executives Association ("SEA"). SEA describes itself as "a nonprofit professional association that promotes ethical and dynamic public service by fostering an outstanding career executive corps, advocates the interests of career federal executives (both active and retired), and provides information and services to SEA members." *See* Senior Executives Association, *About SEA*, http://seniorexecs.org

---

[1] Letter for Daniel Levin, Acting Assistant Attorney General, Office of Legal Counsel, from Marilyn L. Glynn, Acting Director, Office of Government Ethics (Sept. 20, 2004) ("OGE Letter").

(last visited June 2, 2005). In "advocat[ing] the interests of career federal executives," *id.*, "SEA has taken and continues to take and advance positions" on certain issues involving the pay of federal employees in the senior executive service, Letter for Marilyn L. Glynn, Acting Director, Office of Government Ethics ("OGE"), from William L. Bransford, General Counsel, SEA, *Re: Membership on a Professional Association's Board by an Executive Branch Official* at 1 (Aug. 9, 2004) ("SEA Letter"). The official contemplating service on the SEA board already serves on "his Department's Executive Resources Board, which has, among other functions, responsibility for formulating or contributing to the formulation of the Department's recommendation" to the Office of Personnel Management ("OPM") regarding the senior executive service pay system. SEA Letter at 1. If, therefore, the official joins the SEA board, and if SEA has a "financial interest" in a matter involving senior executive pay (e.g., the establishment of a new system of pay), the official (absent a waiver) would have a criminal conflict of interest if he participated in the Executive Resources Board's consideration of the issue.

In the second context, employees of the National Oceanic and Atmospheric Administration ("NOAA") are serving in their private capacities as Councilors of the American Meteorological Society ("AMS"). Letter for Marilyn L. Glynn, Acting Director, Office of Government Ethics, from Barbara S. Fredericks, Assistant General Counsel for Administration, Department of Commerce, *Re: Request for Guidance on the Application of 18 U.S.C. § 208* (Sept. 10, 2004) ("Commerce Letter"). "AMS is a . . . nonprofit organization that promotes the development and dissemination of information and education on atmospheric and related oceanic sciences." *Id.* at 1. A Councilor of AMS "serv[es] on the governing body of the organization, which is the equivalent to service as a member of a board of directors," and, therefore, we assume (without deciding) that a Councilor would be a "director" or "officer" within the meaning of section 208(a). AMS issues "policy statements . . . on issues in which NOAA has an interest, such as meteorological drought, atmospheric ozone, and hurricane research and forecasting." *Id.* The NOAA employees serving as Councilors of AMS "likely will participate in [the] consideration of these issues on a policy level in the course of performing their official duties at NOAA." *Id.* at 1–2. Once again, absent a waiver, they would be disqualified under the criminal conflict of interest statute from such participation if AMS has a financial interest in these matters.[2]

---

[2] In analyzing these issues, we have obtained the views of the Department of the Interior, the Department of Agriculture, the Department of Health and Human Services, the Environmental Protection Agency, the National Science Foundation, and the National Aeronautics and Space Administration, in addition to the views of OGE and the Department of Commerce. *See* Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Sue Ellen Wooldridge, Solicitor, Department of the Interior, *Re: Financial Interests Under 18 U.S.C. § 208* (Mar.

## II.

We conclude that nonprofit organizations such as SEA and AMS do not have a financial interest in a particular matter solely by virtue of spending money to advocate a position on the policy under consideration in that matter.[3]

### A.

Section 208(a), in essentially its present form, was enacted in 1962 as part of a general revision of criminal laws on conflicts of interest. Pub. L. No. 87-849, 76 Stat. 1119, 1124 (1962). The earlier version of the law provided criminal penalties for any federal official who was "directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership or other business entity," and who was "employed or act[ed] as an officer or agent of the United States for the transaction of business with such business entity." 18 U.S.C. § 434 (1958). The revision of 1962 extended the reach of the statute in several respects. Nevertheless, the current text of section 208(a), under the most natural interpretation, indicates that the prohibition does not apply to the policy interest that a nonprofit organization has in a government decision. Section 208(a) provides that, absent a waiver under section 208(b),

> whoever, being an officer or employee of the executive branch of the United States Government, . . . participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application,

---

10, 2005); Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Nancy S. Bryson, General Counsel, Department of Agriculture, *Re: Advocacy of Non-Profit Organizations and 18 U.S.C. 208(a)* (Mar. 16, 2005); Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Ann R. Klee, General Counsel, Environmental Protection Agency (Mar. 16, 2005); Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Lawrence Rudolph, General Counsel, and Charles S. Brown, Assistant General Counsel and Designated Agency Ethics Official, National Science Foundation (Mar. 16, 2005); Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from R. Andrew Falcon, Acting Associate General Counsel for General Law, With the approval of Michael C. Wholley, General Counsel, National Aeronautics and Space Administration (Mar. 22, 2005); Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Edgar M. Swindell, Associate General Counsel for Ethics and Designated Agency Ethics Official, Department of Health and Human Services (May 19, 2005).

[3] We do not address here the interest that a for-profit entity, owing a duty to promote the financial interests of its owners, might have in a matter on which it engages in advocacy on behalf of itself or its clients or that might arise if an entity (whether for-profit or nonprofit) receives, or expects to receive, payment specifically for its advocacy. Thus, the possible interest of a lobbying firm or law firm is beyond the scope of this opinion.

> request for a ruling or other determination, contract, claim, contro-
> versy, charge, accusation, arrest, or other particular matter in which,
> to his knowledge, he, . . . [or] [an] organization in which he is serv-
> ing as officer, director, trustee, general partner or employee, . . . has
> a financial interest[,]

has committed a crime punishable by fine and imprisonment. 18 U.S.C. § 208(a). A disqualifying interest under the statute, therefore, is a "financial interest" "in" a "particular matter." *See Ethics Issues Raised by the Retention and Use of Flight Privileges by FAA Employees*, 28 Op. O.L.C. 237, 239 (2004) ("FAA Opinion").

As ordinarily understood, the interests that AMS and SEA as organizations have in the matters you describe are *policy* interests in the questions being addressed by the government, not *financial* interests in the resolution of those questions. An "interest" in the sense of a "conflict of interest" is an "advantage or profit of a financial nature." *Black's Law Dictionary* 828 (8th ed. 2004). For example, an individual has an interest "[i]n a suit or action" when he has "[a] relation to the matter in controversy, or to the issue of the suit, in the nature of a prospective gain or loss, which actually does, or presumably might, create a bias or prejudice in the mind inclining the person to favor one side or the other." 33 C.J. *Interest* 262 (1924) (footnotes omitted). And an interest is a *financial* one when it is *pecuniary*—when it "pertain[s] to *monetary* receipts and expenditures." *Random House Dictionary of the English Language* 719 (2d ed. 1987) (emphasis added). However, AMS and SEA care about these matters, and spend money to advocate in favor of their preferred outcome, because they support or oppose certain policies, not because the policies at issue will have a financial or pecuniary impact on AMS and SEA as organizations. An organization that has no *financial* reason to prefer one outcome over another would not commonly be referred to as having a "financial interest" in the particular matter.

OGE's regulatory interpretation of section 208 reinforces this view. OGE's regulations interpret the words "financial interest" "in" "a particular matter" to require a link between a governmental matter and a *pecuniary gain or loss* to the employee or specified entity. A disqualifying financial interest is "the potential for gain or loss to the employee, or other person specified in section 208, as a result of governmental action on the particular matter." 5 C.F.R. § 2640.103(b) (2005).[4] *See* FAA Opinion, 28 Op. O.L.C. at 239–40; OGE, *Letter to Designated Agency Ethics Official*, Informal Advisory Ltr. 85x10, 1985 WL 57309, at *2 (July 15). Thus, for example, section 208 does not require an employee of the Department of Interior who owns transportation bonds issued by the State of Minnesota to recuse himself

---

[4] Our Office concurred in OGE's regulatory definition. *See* 61 Fed. Reg. 66,830, 66,830 (Dec. 18, 1996); 28 C.F.R. § 0.25(i) (2004).

from all matters involving the State of Minnesota, only matters that hold the potential for pecuniary gain or loss to the employee. *See* 5 C.F.R. § 2640.103(b) (example 1).

This Office's opinions have drawn a distinction between a "financial interest" and interests that do not involve a pecuniary gain or loss from the resolution of a question. For example, a 1970 opinion by then-Assistant Attorney General Rehnquist distinguished between the *policy* interest that an association representing coal producers had in various Federal Power Commission natural gas proceedings—"an interest of a non-financial kind in the outcome of . . . [the] proceedings" that implicated the coal association's "major purpose"—and a *financial* interest in those proceedings, which the coal association did not have. Memorandum for John W. Dean, III, Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Commissioner Carl E. Bagge's Continued Service as Commissioner of the Federal Power Commission Until February 1, 1971* at 4 (Dec. 10, 1970) ("Rehnquist Opinion").

Against this interpretive backdrop, we cannot conclude that SEA or AMS has a financial interest in the particular matters that are the focus of advocacy by the organizations, as opposed to a mere policy interest in the questions being addressed by the government. The organizations' advocacy expenditures do not constitute a gain or a loss. They do not arise from the pursuit of any financial or economic interests, but only from the pursuit of certain policy goals.[5]

Nor is there any other apparent basis on which to conclude that either organization has a financial interest. In particular, while SEA's members may reap a gain or suffer a loss as a result of a new pay system, the potential for a gain or loss to SEA members as individuals does not disqualify SEA as an organization. Furthermore, whether or not a federal employee's interest in his own federal compensation generally constitutes a disqualifying financial interest under section 208, OGE has issued an exemption, in most circumstances, for the "financial interest aris[ing] from Federal Government . . . salary or benefits." *See* 5 C.F.R. § 2640.203(d) (2005).[6]

---

[5] This conclusion is bolstered by the several examples in OGE's regulations of situations where a "financial interest" might arise, none of which resembles expenses for mere advocacy. The regulation states that a "disqualifying financial interest might arise from ownership of certain financial instruments or investments such as stock, bonds, mutual funds, or real estate," or "might derive from a salary, indebtedness, job offer, or any similar interest." 5 C.F.R. § 2640.103(b) (2005). OGE's regulations also provide illustrations that give other examples of "financial interests," such as land ownership, the "volume and profitability of [a] doctor's private practice," and a grant of funds, *id*. §§ 2635.402(b)(2) (example 1), 2640.103(b) (examples 2, 3), and none of these interests, too, resembles a mere expenditure on advocacy. *See also* Roswell B. Perkins, *The New Federal Conflict-of-Interest Law*, 76 Harv. L. Rev. 1113, 1133 (1963) (a research grant to a nonprofit organization is a "financial interest").

[6] In issuing this exemption, OGE noted the "somewhat differing interpretations" of section 208 that have been advanced regarding a federal employee's interest in his own compensation. *See* 60 Fed. Reg. 44,706, 44,707 (Aug. 28, 1995).

Because an SEA member may participate in matters involving the pay system for senior executives (so long as he does not make determinations that individually or specially affect his own salary and benefits, or determinations that individually or specially affect the salary and benefits of another person specified in section 208, *see* 5 C.F.R. § 2640.203(d)), we cannot say that SEA has a financial interest by virtue of its members' interests.

Any other financial consequences for SEA or AMS that may flow from these matters are speculative. If OPM reached a decision regarding pay for senior executives that accorded with SEA's proposals and arguments, the possibility that SEA had influenced that outcome might attract potential members to join SEA, thus possibly increasing its resources, but OPM's rejection of the proposals and arguments might have the same effect, since potential members who agree with SEA's position might then believe that they should do more to support an organization advancing that position. In either case, SEA might gain members. Conversely, while the failure of SEA's position might lead some members to drop their membership, success might also lead some members to believe that the main purpose of their membership had been achieved and that they could leave the organization. In either case, SEA might lose members. Or perhaps the success or failure of SEA's positions would have no effect at all on membership. The same reasoning could be applied to AMS's advocacy of scientific or research-related policies that government agencies might adopt or reject.[7]

---

[7] We previously considered somewhat similar issues in the Rehnquist Opinion. There, a commissioner of the Federal Power Commission ("FPC") had accepted future employment with the National Coal Association ("NCA"), a trade association of coal producers. NCA "engage[d] in typical trade association activity—lobbying, research, gathering of statistical data." *Id.* at 1. The Rehnquist Opinion stated that the Commissioner

> has not accepted a position with a coal producer, but with NCA, which neither markets nor produces coal. It is the financial interest of *NCA* which determines disqualification under section 208. Certainly NCA has an interest of a non-financial kind in the outcome of various FPC natural gas proceedings: the outcome of these proceedings may have an impact on coal production, and the stimulation of such production is NCA's major purpose. We do not believe, however, that NCA's interest in any given rate or certification proceeding can fairly be characterized as a "financial interest," within the meaning of section 208.

*Id.* at 4. The Rehnquist Opinion went on to consider the argument that NCA would have a "financial interest" in gas proceedings because "NCA's assessments against members are based upon their coal production, and NCA's total income will therefore vary as coal production varies." *Id.* at 5. It concluded, however, "that this relationship is too tenuous and speculative to be regarded as a 'financial interest' of the type prohibited by section 208." *Id.* Even if the Commissioner were going to work for a coal producer, "the impact of any particular natural gas proceedings on the coal producer would vary from case to case, and would depend on the competitive relationships between the producers involved," and "[t]he interest of NCA in such proceedings is even more remote." Lower gas rates might mean lower coal prices rather than greater coal production, and in any event there would be no "necessary correlation between natural gas rates in a particular area and the *total* membership production upon which NCA's income rests." *Id.* (emphasis in original). There, as here, any effect on the financial

The Executive Branch has long taken the position, however, that an employee or other person covered by section 208 has a financial interest in a particular matter only when government action in the particular matter will have a "direct and predictable effect" on the employee's financial interest. *See, e.g.*, 5 C.F.R. § 2640.103(a) (2005); *Advisory Committees—Food and Drug Administration— Conflicts of Interest (18 U.S.C. § 208)*, 2 Op. O.L.C. 151, 155 (1978). A 1963 memorandum from the President to the heads of the executive departments and agencies, issued just a few months after section 208 took effect, stated that a special government employee "should in general be disqualified from participating as such in a matter of any type the outcome of which will have *a direct and predictable effect* upon the financial interests covered by the section." Memorandum to the Heads of Executive Departments and Agencies from the President, 28 Fed. Reg. 4539, 4543 (May 7, 1963) (emphasis added). This same interpretation was incorporated in the Federal Personnel Manual shortly thereafter. *See id.* ch. 735, app. C, at 4 (1988 ed.; added 1965).

The direct-and-predictable effect test also finds support in the traditional legal understanding of what it means to have an "interest" in a proceeding. For example, a financial interest in a proceeding for purposes of judicial disqualification traditionally has required a proximate link between the proceeding and the financial interest. "[A] judge is disqualified," one court explained, "in any litigation where he has any certain, definable, pecuniary, or proprietary interest which will be *directly affected* by the judgment that may be rendered." *In re Honolulu Consol. Oil Co.*, 243 F. 348, 352 (9th Cir. 1917) (emphasis added). "The term 'interested in the case' means a *direct* interest in the case or matter to be adjudicated so that the result must, necessarily, affect his personal or pecuniary loss or gain." *Ex parte Largent*, 162 S.W.2d 419, 426 (Tex. Crim. App. 1942) (emphasis added); *see also Goodspeed v. Great W. Power Co. of Cal.*, 65 P.2d 1342, 1345 (Cal. Dist. Ct. App. 1937) ("It means an interest *direct, proximate*, inherent in the instant event.") (emphasis added).[8] Thus, while it has been suggested that the direct-and-predictable effect test is a gloss on the statutory text, the test reflects a fair construction of the statute's terms in light of their established meaning at the time Congress enacted section 208.[9]

---

interests of an organization's members would not necessarily affect the finances of the organization itself.

[8] In Part II.B.1, we further discuss both the traditional understanding of "interest," as it bears on judicial disqualification and other matters relating to litigation, and the application in those contexts of a test similar to the "direct and predictable" effect test.

[9] OGE relies "on what appears to be a plain reading of 18 U.S.C. § 208." "In cases where an outside organization stipulates that it is spending money to advocate its interests before the Government," OGE explains, "it is difficult to conclude that the organization does not have a financial interest that would be affected directly and predictably by the Government matter." OGE Letter at 3. Furthermore, in OGE's "'long-standing view,'" "the outcome of a 'particular matter,' such as a rulemaking proceeding

OGE's regulations define a "direct effect" as "a close causal link between any decision or action to be taken in the matter and any expected effect of the matter on the financial interest." 5 C.F.R. § 2635.402(b)(1)(i) (2005). While "[a]n effect may be direct even though it does not occur immediately," it is not direct "if the chain of causation is attenuated or is contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter." *Id*. A matter will have a "predictable effect," according to OGE's regulations, if "there is a real, as opposed to a speculative possibility that the matter will affect the financial interest," *id*. § 2635.402(b)(1)(ii), though the regulations do not require that "the magnitude of the gain or loss" be known or that the dollar amount be substantial, *id*. Here, we do not believe that a nonprofit organization's expenditure of money to advocate a policy position establishes that the government's action will have a "direct effect" on a financial interest of the organization.

## B.

Two other considerations support the conclusion that organizations do not have a financial interest in a matter simply because they expend money on advocacy. First, no pecuniary gain or loss to the organization will flow from a particular *action* or *outcome* in the matters, rather than from the *process* by which the government considers the matters. Second, neither organization at issue here falls within the class of persons upon which these matters are focused, even though such a connection is typical where an organization has a financial interest. These two considerations, while not essential to an analysis under section 208 or dispositive of the issues under that provision, offer additional support for our conclusion.

## 1.

The significance of whether financial consequences will flow from a particular *action* or *outcome* in the matter is reflected in the 1963 presidential memorandum that gave rise to the direct-and-predictable effect test. The presidential memorandum references matters "*the outcome of which* will have a direct and predictable effect upon the financial interests covered by the section." 28 Fed. Reg. at 4543 (emphasis added); *see also* Federal Personnel Manual ch. 735, app. C, at 4.

---

affecting the members of an industry, 'can have a direct and predictable effect on the financial interests of an industry trade association' because it prompts the association 'to expend resources to undertake a lobbying effort.'" *Id*. (quoting OGE, *Letter to an Alternate Designated Agency Ethics Official*, Informal Advisory Ltr. 98x2, 1987 WL 1007766, at *2 (Mar. 5). For the reasons set out above, we cannot agree that these expenditures alone constitute a "financial interest" of the organization or association.

Several of our opinions have described the test in terms of the outcome. For example, the Rehnquist Opinion concluded that a trade association representing coal producers had "an interest of a non-financial kind in the *outcome* of various [Federal Power Commission] natural gas proceedings" because "the *outcome* of these proceedings may have an impact on coal production, and the stimulation of such production is [the National Coal Association's] major purpose," but that the interest in these proceedings did not qualify as a *financial* interest. *Id.* at 4 (emphases added). A 1976 opinion issued by this Office explained that "we have taken the position in the past that a Federal employee does not have a 'financial interest' in a particular matter coming before him unless there is a reasonable possibility that the *resolution* of the particular matter would have a 'direct and predictable effect' on an organization in which he owns an interest or holds or is seeking a position." Memorandum for Kenneth A. Lazarus from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Appointment of Chairman of the President's Committee on Science and Technology* at 3 (July 12, 1976) (emphasis added). A 1977 opinion determined whether an employee had a financial interest in a matter involving real property by asking whether the employee had "a financial interest in the *outcome* of the quiet title action." *Conflict of Interest—Litigation Involving a Corporation Owned by Government Attorney*, 1 Op. O.L.C. 7, 7 (1977) (emphasis added). And an opinion issued two years later concluded that an Assistant Secretary of Agriculture was unlikely to have a financial interest in matters involving the union that employed her husband, but explained that, "if a situation did arise in which the *outcome* of a matter might have a direct and predictable effect on his income from the union or on any other personal financial interest, then [the Assistant Secretary] would have to refrain from participating in it." *Conflict of Interest—Financial Interest (18 U.S.C. § 208)—Husband and Wife*, 3 Op. O.L.C. 236, 238 (1979) (emphasis added).

Similarly, OGE's regulations define "financial interest" as "the potential for gain or loss to the employee, or other person specified in section 208, as a result of governmental *action* on the particular matter," 5 C.F.R. § 2640.103(b) (emphasis added), and describe the necessary "direct effect" as "a close causal link between any *decision or action* to be taken in the matter and any expected effect of the matter on the financial interest," *id.* § 2640.103(a)(3)(i) (emphasis added). *See* FAA Opinion at 240; OGE, Informal Advisory Letter 85x10, 1985 WL 57309, at *2. In each of the examples of a disqualifying financial interest described in the regulations, the employee stood to gain or lose depending on the outcome of the matter or some particular action to be taken. For instance, an employee's ownership of transportation bonds issued by the State of Minnesota does not create a disqualifying interest in Minnesota's application for wildlife funds because "*approval or disapproval of the grant*"—i.e., the outcome of the particular matter—"will not in any way affect the current value of the bonds or have a direct and predictable effect on the State's ability or willingness to honor its obligation to

pay the bonds when they mature." 5 C.F.R. § 2640.103(b) (example 1) (emphasis added).

A focus on particular actions or outcomes, moreover, reflects the traditional legal understanding of the terms "interest in a matter," "interest in a proceeding," and similar terms (e.g., "interest in a case" or "interest in an action"), which provided the background against which Congress legislated when it enacted section 208 in 1962. *See Morissette v. United States*, 342 U.S. 246, 263 (1952). In particular, the law governing the analogous issue of mandatory judicial recusal historically focused on whether the judge or similar officer had an interest in the case or proceeding, which was understood to mean "a financial . . . interest that could be affected by the *outcome* of the case." Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* § 4.20, at 148–49 (3d ed. 2000) (emphasis added). It required "a definite, material, financial stake in the direct outcome of the particular case." *Goodspeed*, 65 P.2d at 1345; *see also Worth v. Benton Cnty. Cir. Ct.*, 89 S.W.3d 891, 896 (Ark. 2002) ("[T]o be a disqualifying interest, the prospective liability, gain, or relief to the judge must turn on the outcome of the suit."); *Williams v. Viswanathan*, 65 S.W.3d 685, 689–90 (Tex. App. 2001) (citing cases dating back more than a century to support this rule).[10]

The same meaning attached in other contexts, as well. For example, an "interest in the matter" for purposes of a statutory right to intervene was traditionally understood to mean an interest "in the matter in litigation and of such a direct and

---

[10] Congress enacted the first judicial disqualification statute in 1792. That statute, which remained in effect in substantially the same form until 1974, required that "in all suits and actions in any district court of the United States, in which it shall appear that the judge of such court is, any ways, concerned in interest, or has been of counsel for either party, it shall be the duty of such judge" to disqualify himself. Act of May 8, 1792, ch. 36, § 11, 1 Stat. 275, 278–79; *see also* Act of Mar. 3, 1911, ch. 231, § 21, 36 Stat. 1087, 1090 (amending the statute to include as additional grounds for disqualification bias or prejudice, which, unlike pecuniary interest, was not a recognized ground for disqualification at common law); Act of June 25, 1948, ch. 646, § 455, 62 Stat. 907, 908 (extending the statute to justices and appellate court judges; rephrasing as "any case in which he has a substantial interest"). These words were interpreted by reference to English common law, *see Spencer v. Lapsley*, 61 U.S. (20 How.) 264 (1857), and were understood to refer to a direct pecuniary interest in the outcome of the matter. *See, e.g.*, *In re Honolulu Consol. Oil Co.*, 243 F. 348, 353 (9th Cir. 1917) (a judge is disqualified under section 455 where he is "concerned in interest in the result of th[e] suit"); *In re Grand Jury Investigation*, 486 F.2d 1013, 1016 (3d Cir. 1973) (judge not substantially interested in a case because, among other reasons, he did not have "a special interest in the outcome of th[e] case". The judicial disqualification statute was rewritten in 1974 to reflect the new Canon 3C of the Model Code of Judicial Conduct adopted in 1972. Under the new statute (still codified at 28 U.S.C. § 455 (2000)), a judge must disqualify himself if, among other reasons, "[h]e knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy [for example, in an in rem proceeding] or in a party to the proceeding, or any other interest that could be substantially affected by *the outcome of the proceeding*." *Id.* § 455(b)(4) (emphasis added). "Financial interest" as used in section 455 is a term of art that means, with certain exceptions, "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party." *Id.* § 455(d)(4).

immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." *Bernheimer v. Bernheimer*, 196 P.2d 813, 814 (Cal. Dist. Ct. App. 1948). A potential appellant was "interested in a suit" if it had "a direct and substantial interest in the outcome." *People ex rel. Poage v. Walsh*, 174 N.E. 881, 882 (Ill. 1931). And a disqualifying interest for purposes of determining a witness's interest in an adjudication of a will was "a legal or pecuniary interest in the outcome of the suit." *Fortner v. McCorkle*, 50 S.E.2d 250, 252 (Ga. Ct. App. 1948). "[T]he test" was "whether the witness will gain or lose by the direct legal operation and effect of the judgment." *State v. Robbins*, 213 P.2d 310, 315 (Wash. 1950).[11]

The Supreme Court's opinion in *Tumey v. Ohio* illustrates well the historical distinction between the financial consequences flowing from a proceeding and the financial consequences flowing from the *outcome* of a proceeding. In *Tumey*, the Court held that it violated due process for a mayor to preside over a case in mayor's court where the mayor would receive payment for his services only if he convicted the defendant—i.e., where the mayor had a "direct pecuniary interest in the outcome" of the case. 273 U.S. 510, 535 (1927). In determining what constituted "due process of law," the Court examined the common law of judicial disqualification, and found "no cases at common law" whereby "inferior judicial officers were dependant upon the conviction of the defendant for receiving their compensation." *Id.* at 524. However, there were cases at common law where a judge would have a pecuniary stake in the case that did not depend on the outcome of the case, for example where a judge received daily wages collected from the parties regardless of the outcome. *Id.* at 524–25. A direct pecuniary interest in the outcome of the case, by contrast, was disqualifying at common law, and thus could not be regarded as due process of law. *Id.* at 526, 531. *See also In re Murchison*, 349 U.S. 133, 136 (1955) ("no man can be a judge in his own case and no man is permitted to try cases where he has *an interest in the outcome*") (emphasis added).

Section 208 was enacted against the background of this traditional understanding of what it means to have an interest in a matter. Even if an expenditure on advocacy could constitute a "financial interest" in a particular proceeding, it would be, at most, a financial interest in the *process* by which the matter is considered

---

[11] *See also, e.g.*, *Spencer v. Wilsey*, 71 N.E.2d 804, 809 (Ill. App. Ct. 1947) ("The interest which will render a witness incompetent [under a 'dead man's statute'] must be such an interest in the judgment or decree that a pecuniary gain or loss will come to him directly as the immediate result of the judgment or decree."); *Weber v. City of Cheyenne*, 97 P.2d 667, 669 (Wyo. 1940) ("'Interest,' within the meaning of this rule [for determining real party in interest], means material interest, an interest in issue and to be affected by the decree, as distinguished from mere interest in the question involved, or mere incidental interest."); *cf. Alleghany Corp. v. Breswick & Co.*, 353 U.S. 151, 173 (1957) ("interested party" for purposes of statutory right to be heard in an agency proceeding was "a legal right or interest that will be injuriously affected by the order," i.e., the action to be taken in or outcome of the proceeding).

rather than in the outcome of the proceeding. The absence of any pecuniary interest by SEA or AMS in a particular decision, action, or outcome in the matters at issue reinforces the conclusion that section 208 does not apply to their expenditures on advocacy.

One might argue that placing weight on the decision or outcome at issue is inconsistent with the examples of particular matters specifically enumerated in section 208(a). The statute refers to "a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter." Although it is true that some of the matters specified can be intermediate steps in a larger proceeding, that does not contradict our conclusion that it is the potential outcome that typically will determine whether section 208 can be invoked. The statute covers even "particular matters" that may be terminated before all the possible steps in a process have occurred, but all of the steps, if they occur, typically make up a single "particular matter." *See United States v. Jewell*, 827 F.2d 586, 587–88 (9th Cir. 1987).

The view that intermediate steps would be separate "particular matters" would undercut our understanding of the term "particular matter" for purposes of related statutes. For example, 18 U.S.C. § 207 (2000 & Supp. II 2002) imposes a permanent post-employment ban on representing a party in a "particular matter" in which an individual participated as a government employee. Were a charge and a criminal trial different particular matters, an employee who prepared the charge against a company could, after leaving the government, defend the company at the trial of that charge without violating section 207, on the theory that the charge and the trial were not the same particular matter. The term "particular matter" has not been construed to compel such a surprising and unwarranted result. *See* 5 C.F.R. § 2637.201(c)(4) (2005) ("The same particular matter may continue in another form or in part."); *id.* (example 2) (an application for a wiretap and the prosecution of a person overheard during the wiretap are part of the same particular matter). Our reading of these words, moreover, makes good sense: Section 208 specifically enumerates charges, accusations, and arrests in order to give examples of matters that are "particular" in the sense of being focused on specific individuals or entities or a discrete and identifiable class of individuals and entities, not to suggest that various intermediate steps in an overall proceeding constitute discrete particular matters.[12]

---

[12] It is possible to have a financial interest in an intermediate step in a matter without having an interest in the final outcome. For example, a person who has a contractual right to a fee if the government initiates a rulemaking would have a financial interest in that intermediate step, without regard to the outcome. Because the intermediate step would be part of a larger matter, however, such a person would have an interest in that entire, larger matter.

**2.**

Typically, moreover, a person or entity that has a financial interest in a matter will be within the category of persons or entities on which the "particular matter" is focused. Although we do not conclude that this fact must be present if section 208 is to apply, its absence with respect to SEA and AMS is further confirmation of our conclusion that section 208 does not apply here.

A "particular matter" includes "only matters that involve deliberation, decision, or action that is focused upon the interests of specific persons, or a discrete and identifiable class of persons." 5 C.F.R. § 2640.103(a)(1); *see also* Memorandum for C. Boyden Gray, Counsel to the President, from J. Michael Luttig, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. § 208 to General Policy Deliberations, Decisions, and Actions Relating to Iraq's Recent Invasion of Kuwait* at 3 (Aug. 8, 1990) (same). The term encompasses matters that involve specific parties, such as a government enforcement action against a specific organization, as well as matters of general applicability that are narrowly focused on the interests of a discrete industry, such as the meat packing industry or the trucking industry. *See* 5 C.F.R. § 2640.103(a)(1) (example 3); *id*. § 2635.402(b)(3) (example 2).

The definition of "particular matter" provides a useful tool in analyzing the difficult question of what qualifies as a direct and predictable effect of a decision or outcome in a matter. OGE's regulations explain that,

> [i]f a particular matter involves a specific party or parties, *generally the matter will at most only have a direct and predictable effect . . . on a financial interest of the employee in or with a party*, such as the employee's interest by virtue of owning stock. There may, however, be some situations in which, under the above standards, a particular matter will have a direct and predictable effect on an employee's financial interests in or with a nonparty. For example, if a party is a corporation, a particular matter may also have a direct and predictable effect on an employee's financial interests through ownership of stock in an affiliate, parent, or subsidiary of that party. Similarly, the disposition of a protest against the award of a contract to a particular company may also have a direct and predictable effect on an employee's financial interest in another company listed as a subcontractor in the proposal of one of the competing offerors.

*Id.* § 2635.402(b)(1) note (emphasis added). Logic dictates that the same principle operates even when a particular matter is not limited to specific parties, but extends to a discrete and identifiable class of persons. In most circumstances, the outcome of a particular matter will not have a direct and predictable effect on a

nonprofit organization outside of the discrete and identifiable class of persons or entities upon which the proceeding is focused.

In view of this guidance, it stretches section 208 beyond its limit to conclude that SEA and AMS have financial interests in particular matters that are simply the focus of their advocacy. If an organization were to spend money to issue a press release containing its views on a lawsuit to which it was not a party, we could not say, consistent with this guidance, that it would have a financial interest in the case. The parties to the case might have a financial interest; others whose financial interests would be affected by a particular decision or outcome in the case might have a financial interest; but the rest of the public at large, including non-profit organizations that have policy interests in the case, would not have a financial interest simply by virtue of expressing a view about the case, even if such an organization expends resources to express that view. The same reasoning applies here. The executive pay matter in which SEA has an advocacy interest is not directed at nonprofit organizations like SEA; it is focused on federal employees in the Senior Executive Service. Nor are the science policies described in Commerce's letter focused on regulation of nonprofit organizations like AMS.

### III.

### A.

Nor does this Office's FAA Opinion compel us to conclude that section 208 applies here. The FAA Opinion, to be sure, describes a "financial interest" as "an interest 'pertaining to monetary receipts and expenditures,'" 28 Op. O.L.C. at 239 (citation omitted), and the nonprofit organizations here are making monetary expenditures for advocacy. That opinion also states that "one has a financial interest in a governmental matter only when the particular matter can affect one's finances—i.e., one's monetary receipts and expenditures." *Id.* at 240. The FAA Opinion correctly stated that a required expenditure can give rise to a financial interest. But, in that opinion, it was the outcome of a particular matter that we suggested could give rise to a financial interest in the matter, under circumstances that would surely qualify as a "loss" to the employee (being forced to pay for air travel previously provided free of charge). Specifically, we suggested that an FAA employee who had flight privileges with an airline would have a financial interest in a matter that could result in an airline's losing its ability to fly.

Indeed, one might argue that the FAA Opinion construed the words "financial interest" too broadly. Under one possible definition of "financial interest," a monetary expenditure alone would *never* qualify because a financial interest is a "property interest," such as an equity stake in something. *See Black's Law Dictionary* 828 (8th ed. 2004) (second definition of "interest," defining the word to mean "[a] legal share in something; all or part of a legal or equitable claim to or

right in property <right, title, and interest>"); *The American Heritage Dictionary of the English Language* 912 (4th ed. 2000) (an "interest" is, among other things, "[a] right, claim, or legal share: *an interest in the new company*"). We do not believe, however, that the statute uses "interest" exclusively in this sense of the word. Section 208(a) requires a "financial interest" "in" a "matter," as opposed to a "financial interest" in property or a party, and one does not typically refer to a "legal share" in a matter. *Compare* 18 U.S.C. § 208(a) (requiring a determination whether an employee has a financial interest *in a matter*) *with* 18 U.S.C. § 434 (1958) (section 208(a)'s predecessor, requiring a determination whether an employee has an "interest[] in the pecuniary profits or contracts of any corporation . . . or other business entity"). Nor would the narrower definition cover some seemingly obvious examples of a financial interest, such as the interest of a defendant in a potential judgment against him in a tort action.

We believe, instead, that section 208(a) incorporates a broader understanding of "interest"—a concern based upon the potential for pecuniary gain or loss. 5 C.F.R. § 2640.103(b). An interest *in a matter*, then, is "[a] relation to the matter in controversy . . . in the nature of a prospective gain or loss, which actually does, or presumably might, create a bias or prejudice in the mind inclining the person to favor one side or the other." 33 C.J. *Interest* 262 (1924) (footnotes omitted). Whatever the precise formulation (which we need not resolve here), an expenditure, just like a stock or a bond, can give rise to an interest in a matter, but, as noted, only if a particular action or outcome in the matter holds the potential for a financial gain or a loss to the organization. Only then will the organization have a sufficient *financial* reason for wanting a particular result in the matter.[13]

---

[13] For the difference between the two definitions of "interest," one involving a share in property and the other a relation giving rise to prospective gain or loss, *see* Restatement (First) of Property § 5 (1936) (in effect when section 208 was enacted) ("Note on the Use of the Word Interest in the Restatement: Throughout all the Restatements the word 'interest' is used to denote one of three things: a legal relation, a human desire, and return for the use of money. When the word is used in the last sense the context clearly indicates the meaning. With this exception throughout all the Restatements, except the restatement of Torts, 'interest' is used as defined in this Section; that is, as a word denoting a legal relation or relations. In restating the law of Torts it has been found necessary to use the word 'interest' to denote any human desire. (*See* Restatement of Torts § 1). The two different meanings of the word correspond to existing differences in common and legal usage. When it is said that 'A has sold his interest in Blackacre,' the word is used as it is used in this and other Restatements except the Restatement of Torts; when it is said that 'A has an interest in being free from bodily harm' the word is used as it is used throughout the Restatement of the Law of Torts."); 33 C.J. *Interest* 261–62 (1924) ("As applied to property. The chief use of the term 'interest' seems to be to designate some right attached to property which either cannot, or need not, be defined with precision. It means such a right in or to a thing capable of being possessed or enjoyed as property which can be enforced by judicial proceedings . . . . In a suit or action. A relation to the matter in controversy, or to the issue of the suit, in the nature of a prospective gain or loss, which actually does, or presumably might, create a bias or prejudice in the mind inclining the person to favor one side or the other; such relation to the matter in issue as creates a liability to pecuniary loss or gain from the event of a suit; the benefit which a person

Neither is our conclusion inconsistent with the general understanding that an organization has a financial interest in a matter when it formally intervenes to assert the financial interests of its members. The Rehnquist Opinion stated that "[i]f a pending proceeding [before the FPC] involved intervention by NCA as in [*Natural Gas Pipeline Co. of Am.*, 33 F.P.C. 545 (1965)], or [*Great Lakes Gas Transmission Co.*, 37 F.P.C. 1070 (1967)], participation by [the Commissioner] in the Commission's consideration and decision would obviously be ruled out." Rehnquist Opinion at 4 n.3. Earlier, the Rehnquist Opinion described the financial interest of coal producers in natural gas rates and then cited the two FPC proceedings as support for the proposition that "[t]he interest of coal producers in natural gas rate and certification proceedings has in past years (though not recently) been manifested by their direct intervention, through NCA, in such proceedings." *Id.* at 4. The Rehnquist Opinion thus treated such formal intervention as a means by which the members of the outside organization asserted their financial interests, with the outside organization standing in the shoes of the members. In these circumstances, the outside organization, as the surrogate for its members, could well be found to have a "financial interest" in the proceeding, and a government employee to whom section 208(a) imputes the financial interest of the outside organization would therefore have to recuse himself.

This understanding of formal intervention, however, has no application in the present context. According to Commerce's letter, AMS does not intervene in governmental proceedings involving science policy; it merely issues policy statements. Even if AMS were to intervene in some sufficiently formal manner, AMS's members are not financially interested. They have only a policy interest in the questions being addressed by the government, not a financial or pecuniary interest in the resolution of those questions. AMS, therefore, would not be representing the financial interests of its members. SEA, by contrast, submitted comments in the informal rulemaking involving the establishment of a new pay system for senior executives, and SEA resembles a typical trade association in that it advocates on behalf of the financial interests of its members. However, we need not decide whether SEA's submitting comments in an informal rulemaking constitutes a sufficiently formal intervention to impute the financial interests of its members to SEA, because, as we explained above, SEA's members themselves do not have a disqualifying financial interest in matters regarding the pay system for senior executives. A federal employee's interest in his own federal compensation

---

has in the matter about to be decided and which is in issue between the parties.") (footnotes omitted); *Persky v. Greever*, 202 S.W.2d 303, 306 (Tex. Civ. App. 1947) ("The word 'interest' has more than one meaning, depending upon the manner of its use and the context of the sentence, phrase of grouped words, or subject matter under consideration. An interest may well be said to exist in an action which creates or determines a liability or pecuniary loss or gain, depending upon the result of a trial in court.").

generally does not constitute a disqualifying financial interest under section 208, because OGE has issued an exemption, over a wide range of circumstances, for the "financial interest aris[ing] from Federal Government . . . salary or benefits"—the sort of financial interest that SEA might assert on behalf of its members. 5 C.F.R. § 2640.203(d). Given that an SEA member may participate in matters involving the pay system for senior executives (so long as he does not make determinations that individually or specially affect his own salary and benefits, or determinations that individually or specially affect the salary and benefits of another person specified in section 208, 5 C.F.R. § 2640.203(d)), we cannot say that SEA itself would have a disqualifying financial interest merely by virtue of representing its members' interests.

## B.

Concluding that section 208 encompasses a nonprofit organization's expenditures on advocacy would have untoward consequences. If expenditures on advocacy alone gave rise to a financial interest that implicates section 208(a), the statute would disqualify an employee whenever an organization in which the employee is a director makes any expenditure, even a minimal one, with respect to an issue that might come before him in his official capacity.[14] If, for example, an organization had a meeting to consider whether to take a position on the issue and spent some small amount of money—indeed, perhaps if two salaried employees of the organization, during the time for which the organization pays them, briefly discussed the possibility of taking a position, or if the organization did nothing more than issue a press release—a federal employee who serves on the organization's board would be disqualified from his agency's work on that issue (at least absent a waiver). By logic, the same principle, moreover, would apply to spending on advocacy by *individual* federal employees, as well as organizational spending. Were an employee to purchase a bumper sticker or yard sign expressing an opinion on a policy at issue in a governmental matter, that employee might have a financial interest in the matter under such reasoning.

It seems unlikely that Congress intended for this *criminal* conflict-of-interest statute to reach so far. What led to the regulation of financial interests was the economic temptation to put a finger on the scale that exists when an employee has a financial reason to prefer a particular outcome. But when a government actor has no *financial* temptation, however slight, to prefer one outcome over another, the financial justification for requiring recusal disappears. And, while there are many potential non-financial reasons for requiring a government actor to recuse

---

[14] The statute would apply, however, only if the employee had knowledge of the organization's financial interest. 18 U.S.C. § 208(a) (covering particular matters "in which, to [the employee's] knowledge . . . [an] organization in which he is serving as . . . director . . . has a financial interest").

himself—bias, prejudice, social relationship with the parties, etc.—section 208 singles out only financial interests. "The simplest reason," explained the influential Bar Association Report that led to the enactment of section 208, "is that it is better to control whatever fraction of improper behavior is attributable to economic motives than to control none. The second reason is that regulatory schemes have to be administered. Restrictions on outside economic affiliations can be written with reasonable particularity and enforced with moderate predictability." Association of the Bar of the City of New York, *Conflict of Interest and Federal Service* 17 (1960). Both reasons suggest that section 208 does not reach the advocacy expenditures at issue here.

At any rate, even if section 208 were ambiguous with respect to the question presented, because section 208 is a penal statute, the law requires that it receive a strict construction. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 18 (1926) (interpreting section 208's predecessor). This rule is "not merely a convenient maxim of statutory construction," but "is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited," *Dunn v. United States*, 442 U.S. 100, 112 (1979), and in the separation of powers principle that "'legislatures and not courts should define criminal activity,'" *Ratzlaf v. United States*, 510 U.S. 135, 148–49 (1994) (quoting *United States v. Bass*, 404 U.S. 336, 348 (1971)). And the rule surely applies here, where construing the words "financial interest in a particular matter" to include mere policy-motivated expenditures on advocacy would expand the criminal conflict of interest law beyond its traditional application.

Accordingly, we conclude that SEA and AMS do not have financial interests in the matters you have described.

## IV.

Although section 208(a) may not apply in these circumstances, government employees are under a separate duty to "avoid any actions creating the *appearance* that they are violating the law or . . . ethical standards." 5 C.F.R. § 2635.101(b)(14) (2005) (emphasis added); *see* Exec. Order No. 12674, § 101(n) (Apr. 12, 1989), 3 C.F.R. 215 (1989 Comp.), *as amended by* Exec. Order No. 12731 (Oct. 17, 1990), 3 C.F.R. 306 (1990 Comp.); *see also* 5 C.F.R. § 2635.502 (2005). Among the relevant ethical standards is an obligation to "act impartially and not give preferential treatment to any private organization or individual," 5 C.F.R. § 2635.101(b)(8), and a prohibition against an employee's use of "his public office . . . for the private gain of . . . persons with whom the employee is affiliated in a nongovernmental capacity, including nonprofit organizations of which the employee is an officer or member," *id.* § 2635.702. Citing the predecessor version of these provisions, Exec. Order No. 11222, § 201(c) (May 8, 1965), 3 C.F.R. 130, 131 (1965 Supp.), the Rehnquist

Opinion observed that "[w]hile [the Commissioner] in our judgment cannot be viewed as having the type of *financial* interest covered by 18 U.S.C. 208, the fact remains that NCA does have a direct non-financial interest in any matters affecting coal in its competitive fight with natural gas" and that "even assuming all good faith on [the Commissioner's] part, his participation in the direct regulation of the chief competitor of NCA's members is likely to suggest an inference of preferential treatment or loss of independence which could be difficult to dispel." *Id.* at 6–7. Here, too, when an outside organization on whose board a government employee serves is actively advocating a position, particularly where it devotes a large portion of its budget to such advocacy, the employee's official participation in his agency's work on the same issue may "suggest an inference of preferential treatment or loss of independence" giving rise to an appearance of partiality for purposes of the ethical rules.

As we wrote in the FAA Opinion, OGE takes the view that it "'is not in a position to decide for an agency whether a reasonable person would question the impartiality of [an] employee's participation in a particular matter,'" FAA Opinion, 28 Op. O.L.C. at 244–45 (quoting OGE, *Letter to an Agency Ethics Advisor*, Informal Advisory Ltr. 00x4, 2000 WL 33407281, at *3 (Apr. 11)), and "[t]he same generally holds for this Office; the question of an appearance problem is best left to the employee and the agency based on the facts of a particular case," *id*. at 245. Nevertheless, we note that, on the facts presented to us, there is a substantial question whether it would create the appearance of a conflict for an agency employee who is a director of SEA to participate in an official capacity in deciding on recommendations for the agency's senior executive pay system. SEA apparently is engaged in a broad and active campaign involving communications directly to the agencies of the federal government, in which SEA advances positions about the system for senior executive pay. For example, when OPM issued a notice of proposed rulemaking to prescribe the standards for senior executive pay, 69 Fed. Reg. 45,536 (July 29, 2004), SEA filed a set of comments in response. *See* Comments of the Senior Executives Association on the Proposed Rule Regarding "Senior Executive Service Pay and Performance Awards and Aggregate Limitation on Pay" (undated). SEA lists its "Current Objectives" on its website, and advocacy about the new senior executive pay system used to be the first objective on the list, *see* Senior Executives Association, http://seniorexecs.org (last visited June 2, 2005), and remains one of the objectives, *see id.* (last visited Jan. 11, 2006).[15] At the same time, the Executive Resources Board on which the

---

[15] To the extent that SEA represents its members' interests in the pay system, a director's official role in the matter might not raise an appearance problem, because the regulatory exemption for an employee's actions affecting his own pay or benefits "constitute[s] a determination that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of agency programs or operations." 5 C.F.R. § 2635.501 note (2005). But, apart

employee has served in his official capacity makes recommendations regarding the senior executive pay system. SEA Letter at 1. If an outside organization in which an employee is a director has been advocating its views directly to the federal government on a matter that the organization has identified as especially significant, there is a significantly heightened risk that the employee, by taking a personal and substantial role in the same matter, will at least appear less than independent in his judgments for purposes of 5 C.F.R. § 2635.101(b), and that risk, along with other factors such as the importance of the particular employee's role in the government's deliberations, calls for serious consideration by the employee's agency.[16]

STEVEN G. BRADBURY
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

from this representation of its members' financial interests, SEA as an organization has a substantial policy interest in the SES pay system that raises a separate concern about the appearance of an SEA director's taking part in such agency deliberations.

[16] In contrast, AMS appears in some instances only to have issued public statements about matters identified in the Commerce Letter, rather than directly communicating with federal agencies. *See* Commerce Letter at 2 n.2.